IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 5708 |
| v. | ) ) | Judge Virginia M. Kendall |
| GRETCHEN COURTNEY & ASSOCIATES, LTD., and JOAN FITZGARRALD, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This declaratory judgment action stems from an insurance coverage dispute. Defendant Joan Fitzgarrald sought Under Insured Motorist coverage under a business auto liability insurance policy issued by Nationwide Mutual Insurance Company ("Nationwide") to Gretchen Courtney & Associates, Ltd. ("GCA"). Fitzgarrald maintains that as an employee of GCA, she qualifies as an insured under the Policy and is entitled to coverage for injuries she sustained in a car accident while driving home from an appointment with a GCA client. Nationwide argues that Fitzgarrald was not a GCA employee but rather an independent contractor and is therefore not an "insured" under the terms of the Policy and not entitled to Under Insured Motorist coverage. Nationwide moves for summary judgment and seeks a declaration that Fitzgarrald is not an insured and is not entitled to coverage or benefits provided under the Policy. For the reasons stated herein, Nationwide's Motion for Summary Judgment is denied.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

**I.      Challenges to Rule 56.1 Assertions of Fact**

Nationwide challenges several assertions made by Fitzgarrald in her Local Rule 56.1 Statement of Material Facts. In order to clarify what is properly before the Court and what is not, the Court addresses these arguments before delving into the facts of this case.

**A.      Fitzgarrald's Affidavit**

Nationwide objects on the basis of hearsay, relevance, and lack of foundation to every assertion contained in Fitzgarrald's sworn affidavit. According to Nationwide, Fitzgarrald's affidavit itself is a hearsay document, contains out of court statements offered for the truth of the matter asserted therein, and contains self-serving assertions with no evidentiary support. Nationwide further objects on the basis of relevance to several assertions in the affidavit describing the terms and conditions of Fitzgarrald's relationship with GCA, arguing that such facts are irrelevant in light of the Independent Contractor Agreement between Fitzgarrald and GCA. Nationwide's blanket objection to the affidavit in its entirety is overruled.

First, Fitzgarrald may testify to facts regarding her arrangement with Nationwide when those facts are based on her personal knowledge, including reasonable inferences based on observations and first-hand experience. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003); *cf. Rawal v. United Airlines, Inc.*, No. , 2008 WL 4890169, at *4 n.2 (N.D. Ill. Nov. 12, 2008) (plaintiff's "declaration, like any other sworn affidavit based on personal knowledge, is

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Nationwide's Statement of Facts (Dkt. No. 17) have been abbreviated to "Pl. 56.1 St. ¶ __"; citations to Fitzgarrald's Statement of Material Fact (Dkt. No. 20, p. 2–8) have been abbreviated to "Def. 56.1 St. ¶ __"; citations to Nationwide's Response to Fitzgarrald's Statement of Facts (Dkt. No. 28) have been abbreviated to "Pl. 56.1 Resp. ¶ __"; and citations to Fitzgarrald's response to Nationwide's Statement of Facts (Dkt. No. 20, p. 1–2) have been abbreviated to "Def. 56.1 Resp. ¶ __."

admissible for summary judgment purposes") (citing *Oto v. Metro. Life. Ins., Co.*, 224 F.3d 601, 604–05 (7th Cir. 2000)). Furthermore, courts routinely consider, and the summary judgment rule specifically allows, affidavits from witnesses used to make assertions of fact, so long as those assertions are supported by the record. *See* Fed.R.Civ.P. 56(c)(4) (affidavits and declarations used to oppose summary judgment must be made on personal knowledge); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994) (explaining that although affidavits are ordinarily not admissible evidence at trial, they may be used in summary judgment proceedings where the substitution of oral testimony for the testimony provided in the affidavit would make that evidence admissible at trial). Second, Nationwide's relevance objections are unfounded. As explained in the Court's substantive discussion below, the fact that Fitzgarrald entered into an Independent Contractor Agreement with GCA is not dispositive of the nature of her relationship with GCA. Other factors, particularly the level of control GCA exercised over Fitzgarrald, are pertinent to the inquiry. *Warren v. Williams*, 730 N.E.2d 512, 518 (Ill. App. Ct. 2000); *Lang v. Silva*, 715 N.E.2d 708, 717 (Ill. App. Ct. 1999).

However, Fitzgarrald makes several assertions regarding the terms and conditions of her relationship with GCA that appear to be based on out of court statements made by either GCA or one of its representatives. Specifically, Fitzgarrald states that she was (1) informed that she could not work as an educational consultant for any other company; (2) not allowed to discuss any additional services GCA provided with clients; (3) forbidden from providing her personal contact information to any school or school teachers; (4) informed by GCA that she should inform clients that any questions or inquiries should go through the GCA Office; (5) required to teach from the PowerPoint presentation provided by GCA; (6) required to provide a written report to GCA within 36 hours of completing a workshop; and (7) informed that for any

workshops occurring more than two hours from her home she would be reimbursed for a hotel stay. (Def. 56.1 ¶¶ 15, 17–18, 21, 23, 27.) Fitzgarrald has failed to lay the proper foundation for these assertions and to the extent they are based on statements made by individuals at GCA, they are hearsay statements being offered to prove the terms conditions of her relationship with GCA and are therefore inadmissible. *See* Fed.R.Civ.P. 56(c)(4) (affidavits used to oppose a motion for summary judgment must set out facts that would be admissible); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002) (statements in affidavit premised on hearsay and based on the affiant's "understanding" are inadmissible and cannot be used to defeat a motion for summary judgment); *see, e.g., System Dvmt Integration v. Computer Sciences Corp.*, No. 09 C 4008, 2011 WL 1311903, at *5 n.3 (N.D. Ill. Apr. 1, 2011) (statements made in an affidavit submitted by plaintiff's representative asserting representations purportedly made by defendant's employees inadmissible).

### B. Exhibit Attachments to Fitzgarrald's Rule 56.1 Statement

Nationwide asserts in a footnote to its Reply brief that documents submitted by Fitzgarrald in support of her opposition to summary judgment were not disclosed in preparation for the parties' Joint Status Report and that Fitzgarrald did not timely file a Rule 26 Disclosure Statement until after she filed her Memorandum in Opposition to Nationwide's Motion. Nationwide has not raised any discovery-based objections to these documents in its Local Rule 56.1 Statements nor has it moved to strike the exhibits pursuant to Federal Rule of Civil Procedure 37. Instead, Nationwide objects under Rule 26 in its "reply" to Fitzgarrald's Response to Nationwide's Statement of Facts. (Dkt. No. 29.) However, this reply is not properly before the Court because Local Rule 56.1 does not provide that a party may reply to an opposing party's response to its statement of facts. *See Hudgens v. Wexler and Wexler*, 391 F.Supp.2d 634, 637

(N.D. Ill. 2005) ("[N]owhere does the rule state that a movant may reply to the responses of a non-movant."). Thus the Court will not consider the "unnecessary and improper 'replies' to [Fitzgarrald's] responses." *Id.* (citing *Shulz v. Varian Med. Sys., Inc.*, 315 F.Supp.2d 923, 925 n.1 (N.D. Ill. 2004) ("Such a reply is inappropriate); *accord Kozlowski v. Fry*, 238 F.Supp.2d 996, 1000 n. 2 (N.D. Ill. 2002) ([S]uch a submission by Defendants is neither appropriate nor necessary under the Local Rules."). Any objections to Fitzgarrald's affidavit and attached exhibits based a failure to disclose are deemed waived.

Nationwide also raises several evidentiary objections to documents submitted by Fitzgarrald in support of her opposition to Nationwide's Motion for Summary Judgment. First, Nationwide objects under Fed.R.Evid. 801 to Fitzgarrald's use of a GCA business card purportedly given to her by GCA. The Court overrules Nationwide's objection because the contents of the business card are relevant to Fitzgarrald's state of mind – specifically, her understanding of the nature of her relationship with Nationwide. Thus there is an independent basis for admitting the business card that does not implicate the hearsay rule. In addition, GCA's act of providing a business card and Fitzgarrald's testimony based on her own personal knowledge that GCA gave her the card do not implicate the hearsay rule because such evidence does not involve a statement.

Next, Nationwide objects on the basis for hearsay, lack of foundation, and lack of authenticity to a form entitled "Special Information Request Form-Drivers" that was purportedly sent by Nationwide to GCA two months before the beginning of the relevant coverage period. The Court overrules all three objections. First, Rule 602 of the Federal Rules of Evidence provides that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602.

Thus, in an affidavit, a statement that a witness knows something without statements about *how* the witness is aware of that information is not admissible. *See Ward v. First Federal Savings Bank*, 173 F.3d 611, 618 (7th Cir. 1999); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1988). In this case, Fitzgarrald presents the Special Information Request Form through an affidavit submitted by her attorney, Brian T. Schurter, stating that he is personally aware of the information contained within the form because he received it on October 27, 2011 as an attachment to an email from Michael S. Coleman, a claims specialist at Nationwide Insurance. Fitzgarrald has also provided as a separate exhibit a copy of the October 27, 2011 email. The email from Coleman, taken together with Schurter's affidavit stating that he received the form as an attachment from Nationwide, is sufficient foundation to establish that Schurter has personal knowledge of the form.

With respect to the authenticity of the document, Federal Rule of Evidence 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a). Evidence that satisfies this requirement may include "distinctive characteristics" such as "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed.R.Evid. 901(b)(4). Here, the Special Information and Request Form contains Nationwide's logo, motto ("On Your Side"), and address. It is addressed to GCA and is stamped with a policy number and coverage period identical to the policy at issue in this case. Based on these distinct characteristics, contents, and the evidence demonstrating the circumstances through which Schurter obtained the form, the Court finds that Fitzgarrald has established the authenticity of the exhibit.

6

Lastly, the Court finds that the Special Information Request Form is not hearsay and is admissible pursuant to Federal Rule of Evidence 810(d)(2) as it is a statement that is (1) made by an employee of Nationwide during and on a matter within the scope of the employment relationship, (2) offered by Fitzgarrald, (3) against Nationwide, a party opponent. *See* Fed.R.Evid. 801(d)(2)(D).

## II.    Factual Background

Fitzgarrald's claim for Under Insured Motorist ("UIM")[2] coverage from Nationwide arises from a motor vehicle accident that occurred on September 24, 2009.  On that day Fitzgarrald conducted a workshop at Flossmoor School located in Chicago Heights, Illinois pursuant to an Independent Contractor Agreement (the "Agreement") she entered into with GCA. (*Id.* ¶ 10.)  After completing the workshop for GCA, Fitzgarrald drove in her own motor vehicle toward her home in Rantoul, Illinois. (*Id.* ¶ 11.)  At approximately 6:15 p.m., Fitzgarrald was injured when a motor vehicle driven by Michelle Earnest crossed the median on Interstate 57 and collided with her vehicle. (*Id.* ¶ 12.)  As a result of this accident, Fitzgarrald filed a

---

[2] The Illinois Insurance Code defines an  underinsured motor vehicle as follows:

> [T]he term "underinsured motor vehicle" means a motor vehicle whose ownership, maintenance or use has resulted in bodily injury or death of the insured, as defined in the policy, and for which the sum of the limits of liability under all bodily injury liability insurance policies or under bonds or other security required to be maintained under Illinois law applicable to the driver or to the person or organization legally responsible for such vehicle and applicable to the vehicle, is less than the limits for underinsured coverage provided the insured as defined in policy at the time of the accident.  The limits of liability for an insurer providing underinsured motorist coverage shall be the limits of such coverage, less those amounts actually recovered under the applicable bodily injury insurance policies, bonds, or other security maintained on the underinsured motor vehicle.

215 ILCS 5/143a-2(4).  The legislative purpose of underinsured motorist coverage is to " 'place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance.' " *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 646 (Ill. 2011) (quoting *Susler v. Country Mutual Ins. Co.*, 591 N.E.2d 427, 429 (Ill. 1992)).

lawsuit against Earnest in the Circuit Court of Sixth Judicial Circuit, Champaign County, Illinois. (*Id.* ¶ 13.) That lawsuit was settled and Earnest's auto insurer paid its policy limits to Fitzgarrald. (*Id.* ¶ 14.) After settling with Earnest, Fitzgarrald made an UIM claim to her own auto insurance company, State Farm Mutual Automobile Insurance Company. (*Id.* ¶ 15.) State Farm offered Fitzgarrald its UIM policy limits to resolve her claim against it. (*Id.*)

### A.    Fitzgarrald's Relationship with GCA

### 1.    The Independent Contractor Agreement

In September 2009, Fitzgerald signed a document with GCA entitled, "Independent Contractor Agreement." (*Id.* ¶ 6.) The Agreement provides:

> SECTION 2: INDEPENDENT CONTRACTOR: The Contractor [FITZGARRALD] acknowledges and agrees that the Contractor is an independent contractor with professional qualifications and is not an agent or employee of Courtney [GCA]. The Contractor warrants that (s)he has the requisite expertise, ability, judgment and skill to render the services required by this Agreement. The Contractor further agrees to supply all tools, equipment, and materials required to perform these services, in addition to those provided by Courtney, which are part of the unique concepts, ideas, trade secrets and proprietary business information of Courtney.
>
> SECTION 3: AGENCY: The Contractor has no authority to bind Courtney, to enter into any contracts or agreements on behalf of Courtney, or to represent that the Contractor has the authority to do so. This Agreement does not create a partnership, joint venture, or loan servant arrangement between the parties.
>
> *    *    *
>
> SECTION 5: TAXES: Neither federal, state, nor local payroll taxes of any kind or state disability insurance will be paid or withheld on behalf of the Contractor or its employees, The [sic] Contractor will not be treated as an employee with respect to the services performed under this Agreement for federal or state tax purposes.

8

* * *

<u>SECTION 7: BENEFITS</u>:  Because the Contractor is engaged in the Contractor's own independently established business, the Contractor is not eligible for, and shall not participate in, any employee fringe benefits which may from time to time be provided by Courtney to her employees, if any, including but not limited to sick pay, vacation pay, group medical and dental coverage, pension, and profit-sharing.  No worker's compensation insurance, unemployment insurance, and/or retirement benefits will be provided by Courtney for the Contractor.  Contractor will be solely and entirely responsible for his/her acts during the term of this Agreement and any renewal and/or extension hereof.

(*Id.* ¶ 9.)

## 2. Fitzgarrald's Duties, Responsibilities, and Obligations with Respect to GCA

Fitzgarrald states that her relationship with GCA began in June 2007. (*Id.* ¶ 9.)  Between June 11 and June 15, 2007, Fitzgarrald attended a one-week long training "in the GCA system of strategies to be used by elementary school teachers to better teach elementary students how to read and comprehend." (*Id.* ¶ 10–11.)  GCA paid Fitzgarrald $150 per day in addition to covering all of her expenses for attending the training. (*Id.* ¶ 7.)  Fitzgarrald attended additional trainings in Lake Geneva, Wisconsin, and at the GCA office in St. Charles, Illinois. (*Id.* ¶ 12.)  At these trainings, Fitzgarrald was taught how the GCA system could be used to fit "Common Core" standards that schools were required to meet. (*Id.*)  Again, GCA paid Fitzgarrald $150 per day to attend these trainings also and paid for all of her expenses. (*Id.*)

Fitzgarrald's sole responsibility was to go to schools that had contracted with GCA and provide the specific courses that had been contracted for. (*Id.* ¶ 16.)  Though she did not solicit schools to purchase the GCA system, Fitzgarrald was provided a business card to provide to GCA clients.  (*Id.* ¶¶ 13, 16.)  Fitzgarrald did not work as a consultant or in any other capacity

during this time period and has never advertised or independently sought clients to work as an educational consultant. (*Id.* ¶¶ 14, 19.)  Every workshop Fitzgarrald led was referred to her from GCA. (*Id.* ¶ 20.)  When teaching a workshop, Fitzgarrald used a PowerPoint presentation created and provided by GCA. (*Id.* ¶ 21.)  GCA also provided Fitzgarrald the equipment she needed to conduct the workshops, including a laptop computer, projector, headset speaker system, and any games referenced in the PowerPoint materials. (*Id.* ¶ 22.)  At various times Gretchen Courtney, the President of GCA, or another GCA agent attended workshops and provided reviews of Fitzgarrald's performance. (*Id.* ¶ 24.)  These reviews were provided to GCA.  (*Id.*)

Fitzgarrald was also provided a handbook detailing her responsibilities and obligations as a consultant for GCA (the "Handbook").[3] (*Id.* ¶ 28; Dkt. No. 19-3.)  The Handbook informs that consultants will be expected to, among other things, "know the current literature and research in your area of expertise," "maintain professionalism at all times," "develop client relationships," "arrive at least one and half hours prior to the presentation," "come prepared and organized," "dress for success," "refrain from eating or drinking anything, except water during your presentation," and "present your business cards and present it to the contact person when you meet." (Dkt. No. 19-3, p. 4.)  The Handbook provides that it is the consultant's responsibility to notify the GCA office in advance of all dates the consultant is unable to work, check emails daily, and send PowerPoint presentations to the office for review at least 2-3 weeks prior to conducting a workshop. (*Id.* at 5.)  The portion of the Handbook entitled "Procedures" also instructs consultants to notify GCA of all dates the consultant is not able to work "as soon as

---

[3] Nationwide objects to the relevance of this assertion and to the use of Fitzgarrald's affidavit on the basis of hearsay. (Pl. 56.1 Resp. ¶ 28.)  As discussed in Section I.A above, affidavits supported by the record and based on the affiant's personal knowledge are admissible and GCA's level of control over Fitzgarrald is relevant to the determination of whether she was employee or independent contractor of GCA.  Nationwide raises no other evidentiary objections to the admissibility of the Handbook. (Pl. 56.1 Resp. ¶ 28.)

possible." (*Id.* at 8.)  In addition, the Handbook contains detailed instructions regarding GCA's

Dress-Code and Personal Appearance Policy:

> The personal appearance of our consultants directly reflects on the company.  Therefore, we ask that our professionals follow these simple rules:
>
> - Clean, pressed, properly fitting business attire is appropriate.
> - Hair should be clean, combed and neatly trimmed or arranged.  Shaggy, unkempt hair is not permissible.
> - Sideburns, moustaches, and beards should be neatly trimmed.
> - Good personal hygiene must be maintained.
> - Use perfume or cologne sparingly or not at all, many individuals are sensitive to various scents.
> - Keep jewelry simple and to a minimum; avoid flashy pins and dangling earrings.  All jewelry should remain stationary.
> - Open toed shoes should not be worn.
> - Boots should not be worn.
> - No clothing with spaghetti straps; clothing revealing bare backs, midriffs or shoulders; or any revealing or provocative clothing, neckline should be half way between your clavicle and bust line.
>
> Inclement Weather Days: The company understands that inclement weather conditions may require different attire for the day.  Use good judgment when dressing for weather conditions.

(*Id.* at 6.)

The Handbook also sets forth detailed instructions and limitations for how GCA

consultants should interact with clients. (*Id.* at 7.)  Specifically, the Handbook directs consultants

to, among other things, return all client phone calls promptly, contact a client in the event the

consultant will not arrive within one hour of a scheduled workshop, and follow up a visit with

either a thank you note to the school or a packet of additional requested information. (*Id.*)  The

Handbook further provides that consultants are not to discuss payment issues with the client.

(*Id.*)  The Handbook also details the responsibilities of the consultant with respect to scheduling and executing workshops. (*Id.* at 8.)  According to the Handbook, consultants are required to make client confirmation calls 5-7 business days prior to the workshop date in order to confirm the "date, location, start and end times, and number of participants. (*Id.* at 9.)

Lastly, the Handbook sets out general terms of employment and method of compensation. (*Id.* at 10.)  The Handbook informs the consultant that they "have been hired as an independent contractor" and "will receive an independent contractor agreement for the date(s) of service that must be signed." (*Id.*)  The Handbook also states that consultants will be paid once a month and will be reimbursed for certain hotel and mileage expenses. (*Id.*)  Fitzgarrald confirms that she was paid monthly for the work she performed for GCA based upon an hourly rate of $100 per hour. (*Id.* ¶ 25.)  Accordingly, she received $300 for each half-day (3 hour) workshop and $600 for each full-day (6 hour) workshop. (*Id.*)  In addition to her hourly compensation, Fitzgarrald was reimbursed for mileage and hotel stays when required. (*Id.* ¶ 27.)

### B.    The Nationwide Policy

Nationwide issued a business auto liability insurance policy to GCA under Policy No. ACP BA 5822423522. (Pl. 56.1 St. ¶ 4.)  The Policy was effective from November 1, 2008 to November 1, 2009. (*Id.*)

### 1.    Coverage under the Nationwide Policy

The Policy contains an auto declarations section delineating what individuals are covered and what autos are covered under the Policy.  (*Id.* ¶ 16.)  That section provides in relevant part:

> ITEM TWO – SCHEDULE OF COVERAGES AND COVERED AUTOS:  This policy provides only those coverages where a charge is shown in the premium column below.  Each of these coverages will apply only to those "autos" shown as covered "autos".  "Autos" are shown as covered "autos" for a particular

> coverage by the entry of one or more of the symbols from the
> COVERED AUTO'S section of the Business Auto Coverage Form
> next to the name of the coverage.

(*Id*; Complaint, Ex. A, p. 57.)

The UIM coverage designates the types of autos covered under the Policy's UIM coverage and provides the following descriptions:

> 7 – Specially described "autos" – only those "autos" described in
> Item 3 of the Declarations for which a premium charge is shown
> …
>
> 8 – Hired "autos" only – only those "autos" you[4] lease, hire, rent
> or borrow.  This does not include any "auto" you lease, hire, rent,
> or borrow from any of your "employees", partners (if you are a
> partnership), members (if you are a limited liability company) or
> members of their households.
>
> 9 – Nonowned "autos" only – only those "autos" you do not own,
> lease, hire, rent or borrow, that are used in connection with your
> business.  This includes "autos" owned by your "employees",
> partners (if you are a partnership, members, if you are a limited
> liability company) or members of their households but only while
> used in your business or your personal affairs.

(*Id.* ¶ 17; Complaint, Ex. A, p. 18.)

The policy also contains a commercial auto form endorsement titled "Illinois Underinsured Motorist Coverage." (*Id.* ¶ 18.)  This form provides that Nationwide will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an underinsured motor vehicle where those damages result from the "bodily injury" that is sustained by the "insured" and caused by an "accident." (*Id.*)  Where, as here, the named insured is a corporation,[5] then the following are insured under the Policy's UIM coverage: (a)

---

[4] The policy provides that "the words 'you' and 'your' referred to the named insured [GCA] shown in the Declaration. (Pl. 56.1 St. ¶ 17.)

[5] GCA is a registered and active Illinois Corporation incorporated in Illinois on August 9, 1999 (Pl. 56.1 St. ¶ 2.)

"Anyone 'occupying' a covered 'auto' or a temporary substitute for a covered 'auto' that is taken out of service because of breakdown, repair, servicing, 'loss' or destruction;" (b) "Anyone else 'occupying' an 'auto' you do not own that is a covered 'auto' under this Coverage Form for Liability Insurance;" and (c) "Anyone for damages he or she is entitled to recover because of 'bodily injury' sustained by another 'insured.' " (*Id.*)

### 2. Coverage of Employees under the Policy and the Special Information Request Form

The Policy contains a "Schedule of Nonownership Coverage and Premiums" and a "Supplemental Schedule of Nonownership Coverage and Premium." (*Id.* ¶¶ 3, 6.) Although both schedules list "7" under the column "Number of Employees," the Policy does not identify any GCA employees or independent contractors by name. (*Id.* ¶¶ 3, 6–7.) However, in a form titled "Special Information Request Form – Drivers," dated September 3, 2008, Nationwide provided GCA with a list of 11 individuals and asked GCA to review the list and make any changes or additions needed "[i]n order to keep [the] policy as accurate as possible." (*Id.* ¶ 8.) The form bears the same policy number as the policy issued by Nationwide to GCA and requests that GCA check any individuals that are "No Longer Employed.". (*Id.* ¶ 8.) Joan Fitzgarrald is listed as the second driver in Nationwide's Special Information Request Form. (*Id.*) The form contains Fitzgarrald's date of birth, sex, and driver's license number and the letter "N" appears next to her name under a column titled "Excluded." Nationwide informed GCA in the correspondence that it would "appreciate receiving a reply within 20 days." (*Id.*)

### STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986). However, as noted above, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). As the party opposing the motion for summary judgment, Fitzgarrald "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314 (7th Cir. 2011).

## DISCUSSION

The crux of the disagreement between Nationwide and Fitzgarrald lies in the nature of the Fitzgarrald's relationship with GCA at the time the accident occurred. The UIM coverage afforded by Nationwide to GCA under the Policy includes autos owned by GCA employees, but only while those vehicles are used in GCA's business or personal affairs. Thus the vehicle Fitzgarrald drove home from the GCA workshop on September 24, 2009 would constitute a

"covered auto" if (1) Fitzgarrald is deemed to have been an employee of GCA and (2) driving home after the workshop constitutes use in GCA's business or personal affairs.

## I.    Illinois Law Governs the Interpretation of the Insurance Policy and Independent Contractor Agreement

The Court applies Illinois law in interpreting the terms of the insurance policy and Fitzgarrald's Independent Contractor Agreement with GCA.  First, the parties do not dispute that Illinois law governs the interpretation of both the Agreement and policy.  Furthermore, with respect to the policy, Illinois choice-of-law rules for insurance contracts require that courts use the "most significant contacts" test in determining the applicable law. *United Farm Family Mutual Ins. Co. v. Frye*, 887 N.E.2d 783, 788 (Ill. App. Ct. 2008).  Under this test, "insurance policies are governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to the contract, the place of performance, or other place bearing a rational relationship to the general contract." *United Farm*, 887 N.E.2d at 788.  In this case, Illinois has more significant contacts to the policy than any other state.  Both Fitzgarrald and GCA are citizens of Illinois, the policy was issued in Illinois, the terms of the policy are defined under Illinois law, and the accident giving rise to Fitzgarrald's claim and Nationwide's subsequent declaratory judgment action occurred in Illinois. *See Costello v. Liberty Mut. Fire Ins. Co.*, 876 N.E.2d 115, 120–121 (Ill. App. Ct. 2007) ("Unless some other state has a more significant relationship to the transaction, an automobile policy will be governed by the state where the car was intended to be principally located, even if the car is occasionally located somewhere else.") (citing *Western States Ins. Co. v. Zschau*, 698 N.E.2d 198, 204 (Ill. App. Ct. 1998)); *see also Country Preferred Ins. Co. v. Chastain*, No. 3-11-0702, 2012 WL 7006583, at *2 (Ill. App. Ct. 2012) (unpublished) ("In a suit involving

16

underinsured motorist coverage, the state where the parties entered into the insurance policy and where the car principally covered by the policy is located are the most significant factors in determining which state has the most significant contacts.")  Furthermore, based on the choice of law provision contained in the Independent Contractor Agreement and the fact that the parties do not dispute that Illinois law governs,[6] the Court also applies Illinois law to the interpretation of the Agreement.

## II.    A Factual Dispute Exists as to whether Fitzgarrald was a GCA Employee when the Accident Occurred

"It is well established in Illinois that the question of whether a person is an employee or an independent contractor is for the jury unless the relationship is so clear as to be undisputed." *DeRosa v. Albert F.Amling Co.*, 404 N.E.2d 564, 566 (Ill. App. Ct. 1980).  Thus, under Illinois law, the Court must allow the jury to decide the nature of Fitzgarrald's relationship with GCA unless the undisputed relevant facts are susceptible to only one inference. *See Zaitzeff v. Peregrine Financial Group, Inc.*, No. 08 C 4053, 2010 WL 438158, at *6 (N.D. Ill. Feb. 1, 2010) ("Under Illinois law, '[t]he question of whether one is an … employee or an independent contractor is generally a question of fact.' ") (quoting *Lang*, 715 N.E.2d at 717); *Netzel v. Industrial Com'n*, 676 N.E.2d 270, 273 (Ill. App. Ct. 1997) (even where the facts are undisputed, if those facts "permit more than one reasonable inference, that is, that the claimant was an employee or an independent contractor, then a question of fact, not law, is presented") (citing *Kirkwood v. Indus. Comm'n*, 416 N.E.2d 1078, 1079–80 (Ill. 2001); *Manahan v. Daily News-Tribune*, 365 N.E.2d 1045, 1048 (Ill. App. Ct. 1977); *see also Ware v. Indus. Comm'n*, 743

---

[6] Section 12 of the Agreement, titled "Applicable Law," provides that "[t]his Agreement shall be governed by and interpreted under Illinois law."

N.E.2d 579, 583 (Ill. App. Ct. 2000) ("The question of whether an employment relationship existed at the time of an accident is one of fact.").[7]

In this case, Fitzgarrald argues that summary judgment in Nationwide's favor is improper because Nationwide treated Fitzgarrald as an employee in the insurance policy it issued to GCA and because the Independent Contractor Agreement notwithstanding, the actual terms and conditions of Fitzgarrald's relationship with GCA evidence an employee-employer relationship and not an independent contractor arrangement. The Court addresses each argument in turn.

### A.  Nationwide's Treatment of Fitzgarrald Under the Terms of the Policy

Fitzgarrald argues that Nationwide's Motion should be denied because Nationwide treated Fitzgarrald as an employee in the Policy. In support of this argument Fitzgarrald points to a form entitled "Special Information Request Form-Drivers" sent by Nationwide to GCA on September 3, 2008, about two months prior to the coverage period at issue in this case. The form identifies the Policy by number and coverage period and states that "[i]n order to keep your policy as accurate as possible, we ask that you review the information listed below and make any changes or additions needed." (Dkt. No. 19-6, p. 1.) Further down, the form lists 11 individuals and requests that GCA check any individuals that are "No Longer Employed." Fitzgarrald is the second person named in the list. Fitzgarrald's date of birth, sex, and driver's license number and also appear on the form next to her name. Additionally, the letter "N" appears next to Fitzgarrald's name under a column titled "Excluded."

---

[7] The Seventh Circuit has taken a different position in addressing federal causes of action, finding that the determination of whether an individual is an employee or an independent contractor "is a question of law for the court." *EEOC v. North Knox Sch. Corp.*, 154 F.3d 744, 747 n.1 (7th Cir. 1998) ("The ultimate question of whether an individual is an employee or an independent contractor is a 'legal conclusion' which involves an 'application of the law to the facts.' ") (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 379 (7th Cir. 1991)); *see also Moore v. Vantil*, 97 C 7295, 1999 WL 51802, at *2 (N.D. Ill. Jan. 29, 1999) (recognizing distinction between federal law as applied in Seventh Circuit and Illinois law and applying Illinois law).

The Court finds the Special Information Request Form sufficient to create a factual dispute over whether Nationwide treated Fitzgarrald as an employee under the Policy on the date of the accident. While the form does not conclusively demonstrate Fitzgarrald's coverage status on September 24, 2009, it strongly suggests that Fitzgarrald was, at a minimum, previously considered an employee under the Policy and that Nationwide sent GCA a questionnaire to confirm whether that status should hold into the November 2008 to November 2009 coverage period. The Policy states that its terms extend coverage to seven GCA employees and/or partners. Although this means that at least four of the eleven individuals listed on the Special Information Request Form ultimately did not receive coverage once the Policy was issued, Nationwide has presented no evidence indicating who the seven covered employees were or which individuals listed on the Special Information Request Form were ultimately excluded. Viewing this evidence in the light most favorable to Fitzgarrald, the Court finds that Fitzgarrald has shown a factual dispute as to whether she was one of the individuals covered under the Policy during the relevant coverage period.

**B.      The Terms and Conditions of Fitzgarrald's Relationship with GCA**

The terms and conditions of Fitzgarrald's relationship with GCA also evince a factual dispute over whether Fitzgarrald was a GCA employee or an independent contractor. In Illinois, "there is no rigid rule for determining whether a person is an … employee or an independent contractor." *Doe v. Brouillette*, 906 N.E.2d 105, 116 (Ill. App. Ct. 2009); *see also Netzel*, 676 N.E.2d at 273 ("[T]here is no rigid rule of law governing the determination of whether an employer-employee relationship exists."). Rather, Illinois courts look to a multitude of factors, including "the right to control the manner in which the work is performed; the right to discharge; the method of payment; whether taxes are deducted from the payment; the level of skill required

to perform the work; and the furnishing of the necessary tools, materials, or equipment." *Lang*, 715 N.E.2d at 716. Of these factors, "[t]he most important factor is the right to control and the manner in which the work is done." *Warren*, 730 N.E.2d at 518.

Nationwide directs the Court's attention to the Agreement between GCA and Fitzgarrald, which unmistakably describes Fitzgarrald as an independent contractor. The Agreement states unequivocally that the "[c]ontractor acknowledges and agrees that the Contractor is an independent contractor with professional qualifications and is not an agent or employee of Courtney." (Complaint, Ex. B, p. 2.) The Agreement goes on to explain that the "Contractor will not be treated as an employee with respect to the services performed under this Agreement for federal or state tax purposes." (*Id.*) The section of the Agreement titled "Benefits" provides that "[b]ecause the Contractor is engaged in the Contractor's own independently established business, the Contractor is not eligible for, and shall not participate in, any employee fringe benefits" and that "[n]o worker's compensation insurance, unemployment insurance, and/or retirement benefits will be provided by Courtney for the Contractor." (*Id.* at 3.)

The Agreement suggests that the parties intended that Fitzgarrald work as an independent contractor and not as an employee; however it is not dispositive of the inquiry. *See Ware*, 743 N.E.2d at 586 ("[T]he label the parties apply to their relationship is a minor consideration which may 'in a close case swing the balance by aiding in establishing the true intent of the parties' ") (quoting *Earley v. Indus. Comm'n*, 553 N.E.2d 1112, 1118 (Ill. App. Ct. 1990)); *McConnell v. Freeman United Coal Co.*, 555 N.E.2d 993, 996 (Ill. App. Ct. 1990) ("The fact that the contract designated Koestar as an independent contractor is not controlling; rather, the right to control the manner of doing the work is of principal importance in the consideration of this question."). The Illinois Supreme Court has stated that "although a contractual agreement is a factor to consider, it

does not, as a matter of law, determine an individual's employment status." *Roberson v. Indus. Comm'n*, 866 N.E.2d 191, 205 (Ill. 2007) (quoting *Earley*, 553 N.E.2d at 1118); *see also Manahan v. Daily News-Tribune*, 365 N.E.2d 1045, 1049 (Ill. App. Ct. 1977) ("The parties may enter into a written contract which states their respective rights and duties. The contract may by its terms attempt to create an employer/independent contractor relationship and define the limits of control; however, the actual conduct of the parties determines whether they have created an employer/independent contractor relationship."); *see also Barnes v. Duffy*, No. 02 C 5530, 2004 WL 2931326, at *8 (N.D. Ill. Dec. 15, 2004) (holding that a question of fact existed as to whether defendant was an employee of a trucking company even though defendant signed an "independent contractor agreement" with the company); *Davila v. Yellow Cab Co.*, 776 N.E.2d 720, 725–26 (Ill. App. Ct. 2002) (holding that a question of fact existed as to whether a cab driver was an employee of a cab company even though the cab driver's lease agreement explicitly disclaimed any employer-employee relationship).

In this case, several factors Illinois courts use to determine whether a person is an employee counsel against entry of summary judgment. First and most importantly, it is clear that GCA exercised significant control over Fitzgarrald. Fitzgarrald was directed by GCA to remain apprised of current literature in her area of expertise, check emails daily, notify the GCA office in advance of all dates she was unable to work, send PowerPoint presentations to the office for review at least 2-3 weeks prior to conducting a workshop, arrive at a client site least 90 minutes prior to giving a presentation, "dress for success," develop client relationships, refrain from eating or drinking anything other than water during her presentations, and present her GCA-issued business card upon meeting the contact person of a GCA client. Fitzgarrald was also asked to adhere to a "Dress-Code and Personal Appearance Policy" that imposed specific

21

limitations on her attire, hair style, use of perfume, jewelry, and shoes. In addition, Gretchen Courtney or other GCA agents attended GCA workshops taught by Fitzgarrald to provide reviews on her performance. *See, e.g., McConnell*, 555 N.E.2d at 996 (defendant employees' regular visits to jobsite to monitor work suggested a level of control more akin to an employee-employer relationship). The "right to control the manner in which the work is done" being the most important factor, *Warren*, 730 N.E.2d at 518, these instructions and requirements weigh strongly in favor of a finding that Fitzgarrald was a GCA employee and not an independent contractor.

Other factors also weigh in favor of a finding that Fitzgarrald was a GCA employee. First, Nationwide does not dispute the substance of Fitzgarrald's assertion that GCA provided her with the computer equipment, projectors, speaker systems, and PowerPoint presentation materials used to conduct GCA workshops. This assertion is supported by GCA's Consultant Handbook, which states that "Gretchen Courtney & Associates will supply you with a tablet computer, a projector and a portable microphone system." (Dkt. No. 19-3, p. 5.) The provision of equipment weighs in favor of a finding that an employer-employee relationship exists. *See Ware*, 743 N.E.2d at 585 (provision of equipment factor weighed in favor of plaintiff being an employee where defendant provided "the most expensive piece of equipment used by [the plaintiff]."); *Lang*, 715 N.E.2d at 716; *Netzel*, 676 N.E.2d at 273 (fact that defendant provided claimant "all equipment necessary to perform her duties" suggested an employee-employer relationship); *cf. Enesco Corp. v. Doherty*, 731 N.E.2d 888, 896 (Ill. App. Ct. 2000) (no employer-employee relationship where plaintiff did "not furnish the artists with materials, supplies, tools, equipment, transportation, samples, business cards or an expense account.").

Second, the nature of Fitzgarrald's position and the training she underwent suggest that she was a GCA employee and not an independent contractor. Upon starting as a consultant, GCA conducted and compensated Fitzgarrald for attending a week-long training course specifically designed to train its consultants in the "GCA system of strategies." Fitzgarrald attended two additional trainings conducted by GCA, which focused on how GCA's system could be used to fit with the "Common Core" standards that schools were required to meet. A position that requires substantial training and supervision is indicative of an employee-employer relationship; positions requiring special skills and independent judgment, by contrast, suggest that the individual is an independent contractor. *See Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001).

Third, there is a strong nexus between Fitzgarrald's occupation (teacher) and GCA's business (literacy instruction). *See Wheaton v. Suwana*, 823 N.E.2d 993, 997 (Ill. App. Ct. 2005) (treating the nexus between the worker's occupation and the company's business as an additional factor to be considered when determining whether a worker was an employee or independent contractor); *see, e.g., Zaitzeff*, 2010 WL 438158, at *7 (nexus between plaintiff's occupation (futures broker) and defendant's business (futures commodities merchant) weighed in favor of a finding that plaintiff was defendant's employee).

Fourth, Fitzgarrald's compensation arrangement indicates that she was a GCA employee. GCA paid Fitzgarrald on a monthly basis based on an hourly rate. *Cf. Espenschied v. DirectSat USA, LLC*, 705 F.3d 770, 772–73 (7th Cir. 2013) ("These technicians are more like independent contractors than employees; they spend the work day installing and repairing satellite equipment at customers' homes and are paid on a piece-rate basis—so many dollars per job—rather than being paid a fixed hourly wage."); *but see Central States, Southeast and Southwest Areas*

23

*Pension Fund v. Nagy*, No. 10 C 358, 2011 WL 3021524, at *9 n.8 (N.D. Ill. July 22, 2011) ("WCV's payment of Nagy on an hourly basis does not support either party's position.  It is not uncommon for both employees and independent contractors to be paid by the hour."), *aff'd* --- F.3d ----, 2013 WL 1706413 (7th Cir. Apr. 22, 2013).  GCA also reimbursed Fitzgarrald for her mileage and for hotel expenses incurred while travelling over a certain distance from GCA's home office. *See Nagy*, 2013 WL 1706413, at *6 ("In a typical employer-employee relationship, the employer pays for overhead and other operational expenses, while independent contractors usually bear their own costs.") (citing *EEOC v. N. Knox Sch. Corp.*, 154 F.3d 744, 749 (7th Cir. 1998)).

On the other hand, GCA's treatment of Fitzgarrald for tax purposes evinces a classic independent contractor relationship.  GCA consultants received 1099 form each year and were informed that it was their responsibility to make quarterly filing arrangements. *See Taylor v. ADS, Inc.*, 327 F.3d 579, 581 (7th Cir. 2003) (issuance of 1099 instead of W-2 weighed in favor of finding that plaintiff was an independent contractor and not an employee); *Nagy*, 2013 WL 1706413, at *6 ("We have held in previous cases that the 1099 tax treatment weighs heavily in favor of independent-contractor status.") (citing *N. Knox*, 154 F.3d at 750, and *Neiman*, 285 F.3d at 595); *but see Ware*, 579 N.E.2d 586 ("Whether income tax is withheld has not been found to be a significant factor.") (citations omitted).  The fact that GCA did not provide Fitzgarrald fringe benefits such as sick pay, vacation pay, medical coverage, or pension benefits is also indicative of independent contractor status. *Sulkin v. Chicago Transit Authority*, No. 99 C 8088, 2000 WL 1508241, at *7 (N.D. Ill. Oct. 10, 2000) (plaintiff's lack of sick pay, vacation pay, health insurance, or retirement and pension benefits constituted "objective evidence … conclusively establish[ing] that Plaintiff was an independent contractor").  In addition, the last

page of the Agreement suggests that Fitzgarrald's relationship with GCA was not continuous and that she entered into a separate agreement with GCA for each workshop. *Cf. Ware*, 743 N.E.2d at 587 (parties "operating under a continuous agreement for a period of five years at the time of [the plaintiff's] accident" indicative of employee-employer relationship).

Viewing together the Independent Contractor Agreement, GCA's level of control over Fitzgarrald's work, the fact that GCA provided Fitzgarrald equipment and programming for the workshops, Fitzgarrald's compensation arrangement, the nexus between Fitzgarrald's occupation and GCA's business, GCA's tax treatment of Fitzgarrald, and the absence of fringe benefits, the Court cannot, construing the facts in the light most favorable to Fitzgarrald, conclude that the relevant facts permit only one inference regarding the nature of the relationship between Fitzgarrald's and GCA. *See, e.g., Zaitzeff*, 2010 WL 438158, at *8 (finding that a question of fact existed as to whether plaintiff was an employee or independent contractor where plaintiff signed an agreement identifying him as an independent contractor but defendant controlled several aspects of his work by directing him how to handle client accounts, imposing a dress code, requiring him to change his computer screen saver, and setting his work schedule); *Advanced Cleanroom Technologies, v. Newhouse*, No. 00 C 6623, 2002 WL 206960, at *4 (N.D. Ill. Feb. 11, 2002) (finding it "improper" to decide on summary judgment whether defendant was an independent contractor or employee where defendant executed an agreement that termed him an independent contractor, did not receive any employee benefits, and was responsible for paying his own taxes, but spent 95% of his time working on company matters, was given business cards listing him as the General Manager for the company, used company letterhead, and was listed in the company's marketing brochures as a General Manager). Thus under Illinois

25

law, a factual dispute exists as to whether Fitzgarrald was an employee or an independent contractor based on the terms and conditions of her relationship with GCA.

## II. A Factual Dispute Exists as to whether Fitzgarrald was engaged in GCA's Business or Personal Affairs when the Accident Occurred

The terms of the Policy provide that the driver of a "nonowned auto," which includes autos owned by GCA employees, is covered only while using her vehicle in GCA's business or personal affairs. (Complaint, Ex. A, p. 18.) Thus even if Fitzgarrald is found to be an employee and not an independent contractor of GCA, she would not be entitled to coverage if she was acting outside of GCA's business or personal affairs at the time of the accident. In this case, Nationwide argues that Fitzgarrald is not entitled to coverage under the terms of the Policy because the accident giving rise to her claim occurred during her drive home after she had already finished conducting a GCA workshop.

Under Illinois law, the "primary objective in construing the language of an insurance policy is to determine and give effect to the intention of the parties as expressed by the words of the policy." *Wolfensberger v. Eastwood*, 889 N.E.2d 635, 637–38 (Ill. App. Ct. 2008) (citing *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082 (Ill. 2007), and *Profitt v. OneBeacon Insurance*, 845 N.E.2d 715 (Ill. App. Ct. 2006)). "If the words used in a policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning, and the policy will be applied as written, unless it contravenes public policy." *Rich*, 875 N.E.2d at 1090 (citing *Central Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206 (Ill. 2004), and *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561 (Ill. 2005)). An insurance contract is not ambiguous simply because the parties disagree on a provision's meaning. *Id.* (citations omitted). Furthermore, the Court will consider

26

only "reasonable interpretations of the policy language" and "will not strain to find an ambiguity where none exists." *Wolfensberger*, 889 N.E.2d at 638 (citing *Rich*, 875 N.E.2d at 1090).

In Illinois, the phrase "in your business or your personal affairs" in the context of an insurance policy that provides coverage for the insurer's employees, has been interpreted "to protect employees who are injured 'while acting in the scope of their employment.' " *Wolfensberger*, 889 N.E.2d at 638 (citing *Wausau Underwriters Ins. Co. v. Baillie*, 281 F.Supp.2d 1307, 1316 (M.D. Fla. 2002). Illinois courts have "uniformly held 'summary judgment is generally inappropriate when the scope of employment is at issue.' " *Id.* at 638–39 (recognizing that "Illinois courts have not discussed the propriety of granting summary judgment on a scope of employment issue within the context of an 'Employee as Insured' endorsement" and relying on law applied by Illinois courts in *respondeat superior* cases) (citing *Pyne v. Witmer*, 543 N.E.2d 1304 (Ill. 1989), and *Giannoble v. P & M Heating and Air Conditioning, Inc.*, 599 N.E.2d 1183 (Ill. App. Ct. 1992)). Thus "[o]nly if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting." *Id.* at 639 (quoting *Pyne*, 543 N.E.2d at 1308, and *Giannoble*, 599 N.E.2d at 1186).

Generally, an employee traveling to or from work outside actual work hours is not acting within the scope of their employment. *Pyne*, 543 N.E.2d at 1307; *Hindle v. Dillbeck*, 370 N.E.2d 165, 169 (Ill. 1977). However, "an exception exists for employees who are caused by their employers to travel away from a regular workplace or whose travel is at least partly for their employers' purposes rather than simply serving to convey the employees to or from a regular jobsite." *Id.* (collecting cases); *see also Givenrod-Lipe, Inc. v. Industrial Commission*, 376 N.E.2d 1018, 1020 (Ill. 1978) (workman's compensation case noting that "[i]t is well established

that if an employee is injured during travel to or from other than the normal place of employment, undertaken incidentally to the employment and for the accommodation of the employer, such injuries arise out of and in the course of employment.") (citations omitted); *Warren v. Industrial Commission*, 335 N.E.2d 488, 490 (Ill. 1975) ("There are exceptions to this ordinary applied rule, such as in a case where the trip or travel was made necessary by special circumstances of the employment.").

At the date and time of the accident at issue in this case, Fitzgarrald was not commuting between her home and a "regular jobsite" or "normal place of employment" but was instead traveling to her home in Rantoul, Illinois after conducting a GCA workshop at the remote offsite location of a GCA client in Chicago Heights, Illinois, nearly 100 miles from her place of residence and 150 miles from GCA's office in St. Charles, Illinois.[8]  Under these circumstances, the Court finds that "a reasonable person could conclude from the evidence that [Fitzgarrald] was acting within the course of employment" while driving home from the GCA client-site in Chicago Heights, Illinois after conducting a workshop on behalf of GCA. *See Wolfensberger*, 889 N.E.2d at 639.  Accordingly, under Illinois law, there is a genuine issue of material fact regarding whether Fitzgarrald, if found to be an employee of GCA, was acting within the scope of her employment at the time of her accident.

---

[8] The Court may take judicial notice of the distance between two geographic points. *See Lowrance v. Pflueger*, 878 F.2d 1014, 1018 (taking judicial notice of approximate distances between two geographic locations); *Ikerd v. Lapworth*, 435 F.2d 197, 205 (7th Cir. 1970) (acknowledging that district court was entitled to take judicial notice that Madisonville, Kentucky was more than 100 miles from Terre Haute, Indiana); *see e.g., Humphries v. Coppercrest Leveraged Mortg. Fund*, No. 10-cv-7756, 2012 WL 527528, at *3 (N.D. Ill. Feb. 15, 2012); *United States v. Bell*, 357 F.Supp.2d 1065, 1072 (N.D. Ill. 2005); *B.F. Goodrich Co. v. Goodyear Tire & Rubber Co.*, No. 86 C 3145, at * 3 (N.D. Ill. Feb. 5, 1987).

## **CONCLUSION AND ORDER**

For the foregoing reasons, Nationwide's motion for summary judgment is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  July 19, 2013